# EXHIBIT A

Brandon S. Reif (SBN 214706)
Docket@reiflawgroup.com; breif@reiflawgroup.com
Marc S. Ehrlich (SBN 198112)
mehrlich@reiflawgroup.com
**REIF LAW GROUP, P.C.**
1925 Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone: 310.494.6500

Attorneys for Plaintiff

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF ORANGE

Assigned for All Purposes
Judge Deborah Servino

| | |
|---|---|
| EHC ASPEN PROPERTIES, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>CCUR HOLDINGS, INC., a Delaware corporation; CCUR AVIATION FINANCE, LLC, a Delaware limited liability company; JDS1, LLC, a Delaware limited liability company; IGOR VOLSHTEYN, an individual; and DOES 1 to 20, inclusive,<br><br>Defendants. | CASE NO. 30-2021-01189890-CU-FR-CJC<br><br>**COMPLAINT FOR:**<br><br>1. **BREACH OF FIDUCIARY DUTY**<br>2. **PROFESSIONAL NEGLIGENCE**<br>3. **VIOLATION OF CALIFORNIA CIVIL CODE § 3372 (PROFESSIONAL MALPRACTICE)**<br>4. **FRAUD**<br>5. **NEGLIGENT MISREPRESENTATION**<br>6. **VIOLATION OF INVESTMENT ADVISERS ACT, 15 U.S.C. § 80a-15(a)**<br>7. **VIOLATION OF CALIFORNIA CORPORATIONS CODE § 25235**<br>8. **VIOLATION OF CALIFORNIA CORPORATIONS CODE §§ 25400, 2550**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT

Plaintiff EHC Aspen Properties, LLC, a California limited liability company ("Plaintiff" or "EHC"), by and through its undersigned counsel, brings this complaint against Defendant CCUR Holdings, Inc., a Delaware corporation ("CCUR Holdings"), CCUR Aviation Finance, LLC, a Delaware limited liability company ("CCUR Aviation"), JDS1, LLC, a Delaware limited liability company ("JDS1"), Igor Volshteyn, an individual ("Volshteyn") and Does 1-20, inclusive (collectively, "Defendants"), and alleges as follows:

## I.   SUMMARY OF CASE

1.     This action seeks to hold Defendants liable for recommending an aircraft financing *Ponzi* scheme to Plaintiff through misrepresentations, omissions of material fact, exaggerations and misleading information about the due diligence, background checks, safety of the investment, vetting of the investment mechanics and the unqualified endorsement of the investment.  Defendants acted as unlicensed investment advisors intending to earn compensation for recommending this investment to Plaintiff.  Plaintiff was induced by Defendants to invest $3,760,000 and Plaintiff now understands that the entire investment has been lost.  Plaintiff's investment capital was mostly sourced from three children's inheritance from their deceased mother.

2.     Defendants are to blame for the losses.  Prior to making the investment, Defendants provided Plaintiff with marketing materials to entice Plaintiff to invest in the scheme. Defendants endorsed and recommended the investment to Plaintiff with assurances that they fully vetted the investment opportunity and explicitly stated that both the investment and the principals running it were "squeaky clean."

3.     Defendants recommended the investment in exchange for compensation for their investment advice services - a share in the "profit" - even though none of the Defendants were licensed as investment advisors or a registered investment advisory firm.

4.     Plaintiff was unaware and unknowledgeable that the marketing materials presented by Defendants to Plaintiff to invest were riddled with falsehoods and omissions, and missing disclaimers and safe-harbor notices that were required to accompany investment materials containing forecasts based on alleged past performance.

COMPLAINT

5. Defendants made numerous false and misleading representations, including the promise that the investment was "securely held" in escrow, that the Defendants were endorsed insureds on the investment's insurance policies, and that Defendants had sole access to the escrow account and other material falsehoods.

6. Defendants also missed numerous "red flags" that would have alerted them to conduct a further inquiry into the security of the investment and the individuals and entities involved in the underlying transactions, and they misrepresented that they had conducted comprehensive due diligence and concluded the background checks on the scammers were "squeaky clean." Had the Defendants disclosed these material facts, Plaintiff would not have invested in the scheme. As a matter of fact, Serrano expressed concern of the investment's soundness, but Defendants quelled those concerns emphasizing the safety of the investment, the insurance coverage and the reliability of the business partners and affiliates in the deal, all of which convinced Plaintiff to proceed with the investment.

7. Defendants further violated federal and state securities laws because they were not registered with the SEC as investment advisors or investment advisory firms when they induced Plaintiff to enter into a series of securities investments, for compensation, regarding the investment in two aircraft financing transactions. Defendants' profit-sharing agreement to earn 30% of profits with respect to the investment was an illegal agreement because the Defendants were not securities licensed professionals.

8. As a result of Defendants' unlawful conduct, Plaintiff lost its entire investment of $3,760,000, which was mostly sourced from three children's inheritance from their deceased mother.

## II.   THE PARTIES

9. Plaintiff EHC Aspen Properties is, and at all times mentioned herein was, a limited liability company organized and existing under the laws of the State of California, with its principal place of business located at 3121 Michelson Dr. Suite 175, Irvine, County of Orange, California 92612.

10. Defendant CCUR Holdings is, and at all times mentioned herein was, a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 6470 East Johns Crossing, Suite 490, Duluth, Georgia 30097. Plaintiff is informed and

1  believes, and on that basis thereon alleges, that CCUR is not an SEC-registered investment advisory

2  firm or a FINRA broker-dealer.

3      11.     Defendant CCUR Aviation Finance is, and at all times mentioned herein was, a limited

4  liability company organized and existing under the laws of the State of Delaware, with its principal

5  place of business located at 6470 East Johns Crossing, Suite 490, Duluth, Georgia 30097.  Plaintiff is

6  informed and believes, and on that basis thereon alleges, that CCUR Aviation is not an SEC-registered

7  investment advisory firm or a FINRA broker-dealer.

8      12.     Defendant JDS1 is, and at all times mentioned herein was, a limited liability company

9  organized and existing under the laws of the State of Delaware, with its principal place of business

10  located at 2200 Fletcher Avenue, Suite 501, Fort Lee, New Jersey 07024.  Plaintiff is informed and

11  believes, and on that basis thereon alleges, that JDS1 is not an SEC-registered investment advisory firm

12  or a FINRA broker-dealer.

13      13.     Defendant Volshteyn is, and at all times mentioned herein was, an individual residing in

14  the State of Texas.  Volshteyn is, and at all times mentioned herein was, the President of both CCUR

15  Holdings and CCUR Aviation.  Plaintiff is informed and believes, and on that basis thereon alleges, that

16  CCUR Holdings and CCUR Aviation shared the same office, employees, and resources.

17      14.     CCUR Holdings and CCUR Aviation are referenced collectively herein as "CCUR."

18      15.     Plaintiff is informed and believes, and based thereon alleges, that Volshteyn and/or

19  others senior officers and agents, including Steven Singer, Gary Singer, Robert Pons and David Nicol,

20  exercised control and dominion over CCUR as his alter ego with a disregard for the separate legal status

21  of these entities, with the purpose of defrauding Plaintiff.

22      16.     Plaintiff is informed and believes, and based thereon alleges, that each of the Defendants

23  are the agents, servants, employees, partners, joint venturers, aiders and abetters and enablers of each

24  other, and in doing the actions or inactions alleged herein, acted within the course and scope of their

25  relationships with each other, and with the full knowledge and consent of each of the other Defendants,

26  and with an awareness of their wrongdoing, and that their conduct would substantially assist in the

27  accomplishment of the harm and damage to Plaintiff.

28

Exhibit A, Page 15

17.     Plaintiff has no knowledge of the true names and capacities of the defendants sued as DOES 1-20, inclusive, and therefore pursuant to California Code of Civil Procedure §474 sue them by such fictitious names. Plaintiff shall seek leave to amend this pleading to allege the true names and capacities of said DOE defendants if and when their identities and roles are discovered. Each DOE defendant is legally responsible in some manner for the occurrences and damages alleged in this action and Plaintiff's damages were proximately caused by these DOE defendants' acts.

## III.     JURISDICTION AND VENUE

18.     Jurisdiction and venue are proper in this Court because this is an unlimited civil action in the amount that exceeds the sum of $25,000, and a substantial part of the events giving rise to the claims asserted herein occurred in this judicial district.

19.     This Court has personal jurisdiction over each Defendant because each Defendant purposefully directed its activities at this judicial district, specifically, each Defendant was doing business continuously in the State of California and this judicial district, a substantial part of the wrongful acts committed by each Defendant occurred in the State of California and this judicial district, each Defendant knew that the damages and other harmful effects of its activities occurred in the State of California and this judicial district, and the agreements referenced in this Complaint were executed and performed by Plaintiff in this judicial district.

## IV.     FACTUAL ALLEGATIONS

**A.      Defendants CCUR and Volshteyn Provided Plaintiff with False and Misleading Marketing Materials to Lure Plaintiff into Investing in the Scheme.**

20.     The sale and purchase of a private aircraft typically involves multiple parties and complex transactions involving millions of dollars. Defendants capitalized on the opaque structure of these transactions in order to lure Plaintiff into investing in an aircraft financing transaction that turned out to be a *Ponzi* scheme. As a result of the scheme, Plaintiff lost its entire investment of $3,760,000.

21.     On August 24, 2020, Luis Serrano ("Serrano"), Plaintiff's managing member, was introduced by e-mail to Defendant Volshteyn through a mutual friend who told Serrano about a lucrative investment opportunity through Volshteyn's investment firm, CCUR.

Exhibit A, Page 16

22.     Serrano told the third-party intermediary that he was weary of being victimized by an investment scam, particularly because Plaintiff's investors included three children ages 6, 11 and 14, who inherited money from their deceased mother.

23.     To assuage Serrano's concerns, Volshteyn provided Serrano with a 10-page PowerPoint, entitled, "CCUR Holdings, Inc., Aircraft Finance Opportunity August 2020" ("CCUR PowerPoint"), a copy of which is attached as Exhibit ("Ex.") 1.

24.     The CCUR PowerPoint represented that CCUR "believes there is a significant opportunity to provide *fully refundable* deposits into the aircraft finance market." (emphasis added.) (*See* Ex. 1, p. 2.). The fully refundable phrase gave Plaintiff the false impression that the investment capital was safe and can be returned upon demand.

25.     The CCUR PowerPoint further represented that CCUR, along with its "partners", have funded $35,000,000 since August 2018, and that across its deals, CCUR "has generated an annualized return of almost 23%, something we believe is extremely attractive given the cash like nature of the investment." (*See* Ex. 1, p. 2.) These figures gave Plaintiff the false impression that the investment had a long track record of success and created assurances of future performance. Indeed, the PowerPoint failed to provide disclaimers and safe harbor notices typical to disclaim performance on future returns.

26.     According to the CCUR PowerPoint, CCUR partnered with "one specific broker" and a "national recognized title company" to provide a "unique and secure structure that provides fully refundable deposits during the initial due diligence period for aircraft." (*See* Ex. 1, p. 2.)

27.     Defendant Volshteyn, on behalf of himself and the corporate Defendants, disclosed to Plaintiff that the "one specific broker" was nonparty Frederico "Fred" Machado ("Machado"), and the "national recognized title company" was nonparty Wright Brothers Aircraft Title, Inc. ("WBAT").

28.     Machado, a witness under criminal indictment, owned and operated South Aviation, Inc. ("SAI") and Pampa Aircraft Financing ("PAF"), based in Fort Lauderdale, Florida.  SAI and PAF acted as "brokers" for the fraudulent buyers of the aircrafts.

29.     The escrow company, WBAT, was owned and operated by another nonparty witness under criminal indictment, Debra Lynn Mercer-Erwin ("Mercer"), and was based in Oklahoma City, Oklahoma.  WBAT acted as the escrow agent in the aircraft purchase transactions.

30.     Both Machado and Mercer were named in a recent federal grand jury indictment, filed in the Eastern District of Texas on February 24, 2021, which described in detail their aircraft financing *Ponzi* scheme amounting to $350,000,000 in losses for investors, and their involvement in illegally registering the aircrafts through their entities, which were then used by international drug traffickers to transport drugs into the United States.

31.     The CCUR PowerPoint also represented that this investment opportunity existed because the global marketplace for aircraft transactions was "highly opaque" and, therefore, it required soft money deposits due to a common practice of back-to-back purchase agreements where the broker became the buyer so the broker would earn a profit on the transaction.  (*See* Ex. 1, p. 2.)

32.     According to the CCUR PowerPoint, CCUR "always remains in full control of the funds and is the sole party that can order the release of funds from escrow." (*See* Ex. 1, p. 2.)  These false and misleading representations were relied upon by Plaintiff to make the investment.

33.     The CCUR PowerPoint emphasized in all capital bold letters: "ALL FUNDS SECURELY HELD IN ESCROW WITH TITLE COMPANY." (*See* Ex. 1, p. 3.)  CCUR continued to make clear the "deposit can only be returned to CCUR" and "the title company can only take direction from CCUR." (*See* Ex. 1, p. 4.) These false and misleading representations were relied upon by Plaintiff to make the investment.

34.     The CCUR PowerPoint represented that CCUR only participated in the "LOI/Pre-Inspection Stage" during which the "Refundable Purchase Deposit" was wired to a third-party aviation escrow company, identified as WBAT, as proof of funds while the purported buyer performed pre-inspection engineering work.  (*See* Ex. 1, p. 4-5.)

35.     The CCUR PowerPoint represented that CCUR's deposit "is returned immediately prior to the pre-purchase inspection" which lasted approximately four months. (*See* Ex. 1, p. 4.)

6
COMPLAINT

36.     The CCUR PowerPoint identified WBAT as its exclusive escrow company and represented that CCUR was named as an additional insured under WBAT's "crime insurance policy." (*See* Ex. 1, p. 5.) These false and misleading representations were relied upon by Plaintiff to make the investment.

37.     The CCUR PowerPoint provided redacted sample "deal documents" consisting of an escrow agreement between CCUR and WBAT, a letter agreement between CCUR and the purported buyer of the aircraft, and an aircraft purchase agreement between the purported seller and buyer of the aircraft. (*See* Ex. 1, p. 2.)

38.     The CCUR PowerPoint further represented that CCUR has "generated an annualized return of almost 23%" and its strategy has "returned a 22.8% annualized return with a duration of less than 4 months." (See Ex. 1, pp. 2, 7.) Plaintiff relied on these past returns as a promise of future returns. The CCUR PowerPoint failed to provide the requisite disclaimers and safe-harbor notices to dispel the promised returns.

39.     After boasting about CCUR's achievements, the CCUR PowerPoint offered investors the opportunity to fund the Refundable Purchase Deposits for two 767 aircrafts that were expected to be converted from passenger to cargo aircraft. The term sheet required a $10,000,000 investment to be deposited with WBAT, 6% paid in advance, with a maturity date of November 26, 2020, and one 30-day option to extend. The aircraft were identified by their Serial Numbers - 40342 and 40343 - and their Registration Numbers: 4KAI01 and 4K-AZ81. (*See* Ex. 1, p. 9).

40.     During the recommendation stage, Defendants stated that if Plaintiff decided not to invest the $4,000,000, Defendants would take the full $10,000,000 investment for themselves. This statement influenced Plaintiff to invest and created time pressure for Plaintiff to decide to invest. Defendants' statement of intent further endorsed the investment's soundness.

Exhibit A, Page 19

**B.** **Defendant CCUR and Volshteyn Failed to Conduct Adequate Due Diligence on the Individuals and Entities Involved and Continued to Make Material Misrepresentations.**

41.     Based on the misrepresentations made in the CCUR PowerPoint, Serrano was induced to advance discussions of the investment opportunity with Volshteyn, acting for himself and the corporate Defendants.

42.     During these calls, Volshteyn made numerous false and misleading representations to Serrano to induce Plaintiff to make a multi-million dollar investment to fund the Refundable Purchase Deposits.  Volshteyn failed to disclose numerous material facts that, if disclosed, would have caused Plaintiff not to invest. Specifically:

        a.     Volshteyn falsely represented that CCUR conducted comprehensive due diligence on the individuals and entities involved in the aircraft financing transactions, and that their background checks came back "squeaky clean." Had CCUR conducted this due diligence, CCUR would have discovered there were numerous red flags, including a developer's lawsuit against Machado for defaulting on an aircraft financing transaction in 2015, and a news article raising concerns that one of Mercer's company had registered thousands of aircrafts, but was located in Onalaska, Texas, a small town without an airport.

        b.     Volshteyn falsely represented that CCUR conducted background checks on the proposed buyers and sellers of the aircrafts, including Machado and Mercer. Had CCUR conducted this due diligence, it would have discovered that neither the sellers nor buyers were legitimate.

        c.     Volshteyn falsely represented that the entities owned by Machado and Mercer – WBAT, SAI, and PAF – were reputable companies that had been in business for 20 years.  In truth, Machado had been sued previously for defaulting on an aircraft financing transaction, which resulted in a $1.7 million judgment against him in 2015.

        d.     Volshteyn, as well as the CCUR PowerPoint, falsely represented that CCUR and Plaintiff would be named additional insureds under WBAT's commercial general liability policy, which included a "primary crime" coverage for $5,000,000 and "excess crime" for $15,000,000.  The true fact was that CCUR did not diligently pursue and obtain this critical requirement and, as a result, WBAT's

8
COMPLAINT

1  insurance policy named CCUR and Plaintiff as "certificate holders" – which merely entitled them to

2  notice.  Neither CCUR nor Plaintiff was named as an additional insured on the policy. Volshteyn's

3  representations led Serrano to believe WBAT's policy named Plaintiff as an additional insured, which

4  was not the case.

5          e.      Serrano raised his initial concern that the aircraft financing transactions seemed

6  'too good to be true' to the intermediary. The intermediary immediately forwarded it to Volshteyn, who

7  in response, sent the CCUR PowerPoint to Serrano. Volshteyn further represented to Serrano that they

8  had conducted comprehensive due diligence on the security of the investment and the individuals and

9  entities involved, including Machado, Mercer and their entities, and that their background checks came

10  back "squeaky clean."

11          f.      Plaintiff had no experience in aircraft financing transactions, including the

12  proposed "unique and secure structure" of the aircraft financing transactions promoted by Volshteyn and

13  the CCUR PowerPoint.  Plaintiff relied to its detriment on Defendants for honest and competent

14  investment advice and expertise, but instead Defendants lured them into a *Ponzi* scheme.

15  **C.     In Reliance on Defendants' Misrepresentations, Plaintiff Invested $3,760,000 for the**

16          **Refundable Purchase Deposits and Agreed to Share Profits with Defendant JDS1**

17          43.     In reliance on Defendants' numerous misrepresentations in the CCUR PowerPoint and

18  through Defendant Volshteyn's telephone calls and other communications, on or about August 27, 2020,

19  Plaintiff entered into a series of agreements to invest $3,760,000 as part of the Refundable Purchase

20  Deposits for the aircraft financing transactions, including a profit-sharing agreement with Defendant

21  JDS1.

22          44.     These agreements for securities transactions were illegal because Defendants were not

23  registered with the SEC or the State of California as investment advisory firms when they induced

24  Plaintiff to enter into them.  Indeed, Defendant JDS1's profit-sharing agreement to earn 30% of profits

25  with respect to the investment was an illegal agreement because JDS1 was not a securities licensed

26  professional.

27

28

Exhibit A, Page 21

45.   First, Plaintiff entered into two separate escrow agreements with WBAT, whereby Plaintiff agreed to deposit a total amount of $3,760,000, representing $1,880,000 for the refundable purchase deposit for aircraft with Serial Number 40342, and $1,880,000 for the refundable purchase deposit for aircraft with Serial Number 40343.  The deposits were to be held in escrow by WBAT.

46.   Second, Plaintiff entered into two separate letter agreements with Machado's company, SAI, whereby Plaintiff agreed to make the $3,760,000 deposit with WBAT to be held in escrow for SAI, the proposed buyer of the two aircrafts, to use as part of the Refundable Purchase Deposit.  In exchange, SAI agreed to pay Plaintiff $240,000.  In each Letter Agreement, SAI represented that its intention was to "take acceptance of the Aircraft not later than November 26, 2020, whereupon the Refundable Deposit shall be returned immediately to Depositor [Plaintiff]."  Each Letter Agreement included as an exhibit a Letter of Intent ("LOI") between SAI, the proposed buyer, and Innovative Aerospace Leasing, LLC, the proposed seller, whereby SAI offered to purchase each aircraft for $25,000,000. Plaintiff is informed and believes, and on that basis alleges, the LOIs were fraudulent because the aircrafts were not for sale.

47.   Third, Plaintiff entered into a one-page letter agreement with Defendant JDS1, whereby Plaintiff agreed to pay JDS1 30% of all profits received with respect to the investment in the two aircraft deposit transactions.  Defendant Volshteyn told Serrano that Defendants wanted the 30% profit-sharing agreement as a side deal.  At the time, Plaintiff was unaware, and Defendants failed to disclose, that JDS1 was a different entity than CCUR.

48.   On or about August 27, 2020, Plaintiff sent two wires to CCUR in the total amount of $3,760,000, representing $1,880,000 for each aircraft deposit.

49.   On or about August 28, 2020, CCUR provided Plaintiff with a certificate of WBAT's commercial general liability policy with a "primary crime" coverage for $5,000,000 and "excess crime" for $15,000,000.  The insurance policy named Plaintiff as a "certificate holder" but Defendants misrepresented to Plaintiff that Plaintiff was an insured on the policy.

Exhibit A, Page 22

50.     The same day, August 28, 2020, WBAT sent CCUR two separate letters confirming that WBAT received CCUR's two deposits in the total amount of $10,000,000, representing $5,000,000 for each aircraft deposit. Plaintiff's investment was part of CCUR's deposits to WBAT.

51.     On or about November 27, 2020, Plaintiff entered into another letter agreement with SAI, whereby Plaintiff agreed to extend the maturity date when the deposit had to be returned, which had expired on November 26, 2020. The new maturity date was January 25, 2021.  In each letter agreement, SAI represented that its "present intention is to take acceptance of the aircraft no later than January 25, 2021." SAI further represented that it would wire Plaintiff $240,000, in consideration for Plaintiff's agreement to accept the extension.

52.     That same day, CCUR provided Plaintiff with a new certificate of WBAT's commercial general liability policy with the "primary crime" coverage for $5,000,000 and "excess crime" for $15,000,000.  The insurance policy named Plaintiff as a certificate holder, but Defendants misled Plaintiff to believe that Plaintiff was an insured on the policy.

53.     Plaintiff never interacted with Machado, Mercer, or their entities to induce the investment. All of Plaintiff's communications went through Defendants, including Volshteyn and other representatives of CCUR. Indeed, Volshteyn specifically told Plaintiff in an email dated August 25, 2020, that CCUR was acting as Plaintiff's "agent."

54.     Plaintiff relied on Defendants because they were in the best position and with the most resources to ascertain the viability of Plaintiff's investment.  Plus, Defendants touted their experience in this arena as their business platform. Indeed, Plaintiff agreed to pay JDS1 30% of all profits received from the investment in exchange for Defendants' expertise and investment advice as to the investment.

55.     Had Defendants performed the service promised, including and especially reasonable due diligence, they would have discovered that the aircraft financing *Ponzi* scheme promoted and marketed, differed from a lawful aircraft purchase transaction in two critical ways.  First, the loan money was for the Refundable Purchase Deposit, not the purchase of the aircraft. In a typical financing arrangement, the loan is for the purchase of the aircraft, not the deposit. If a buyer cannot afford the deposit, it signals to the seller that the buyer is not capable of purchasing the aircraft.  Second, the fraudulent buyer never

Exhibit A, Page 23

1  inspects the aircraft, and the sale of the aircraft is never consummated because the aircraft is owned by

2  someone else and not actually for sale or the aircraft has been decommissioned. The fraudulent escrow

3  company transfers the Refundable Purchase Deposit into accounts designated by the fraudulent buyer to

4  be used for other purposes, instead of the purchase of the aircraft, and the deal falls through.  The

5  fraudulent buyer then secures another loan from a different lender for another unsellable aircraft, which

6  pays for the principal and interest owed to the previous lender.

7      56.    Instead of conducting reasonable due diligence that would have uncovered these material

8  differences between a legal aircraft financing transaction and the *Ponzi* scheme, Defendants shirked their

9  obligations and advised Plaintiff that the investment was "securely held" and "fully refundable" as a

10  Refundable Purchase Deposit in escrow.

11      57.    Defendants' material misrepresentations, omissions of material facts, and failure to

12  conduct adequate due diligence on the individuals and entities involved in the aircraft financing

13  transactions, the individuals' criminal history, their past performance, and the illegality of the structure

14  of the transactions has caused Plaintiff to lose its entire investment of $3,760,000.

15      58.    In or about December 2020, Serrano learned from the intermediary that Mercer had been

16  arrested for an unrelated investment scheme, but he was told that Plaintiff's investment was secure.

17  Serrano subsequently learned in mid-January that Plaintiff's investment was embezzled.

18      59.    On or about January 13, 2021, CCUR and Plaintiff, along with other investors, sent a

19  letter to WBAT, whereby they provided notice to WBAT that all of their agreements were terminated,

20  and they demanded the return of their deposits in the total amount of $10,000,000.  WBAT did not

21  respond to the letter.

## FIRST CAUSE OF ACTION

### Breach of Fiduciary Duty

### (Against All Defendants and Does 1-20)

25      60.    Plaintiff realleges and incorporates by reference each and every allegation set forth

26  hereinabove, inclusive.

12

COMPLAINT

61.     Defendants owed Plaintiff a fiduciary duty because they held themselves out as providing specialized investment knowledge, experience, and expertise.  Plaintiff never communicated or interacted with Machado or Mercer. All of Plaintiff's interactions went through Defendant Volshteyn or other CCUR representatives.  Indeed, Volshteyn specifically told Plaintiff that CCUR was acting as Plaintiff's "agent."  As a result, Plaintiff relied entirely on Defendants for investment advice concerning its $3,760,000 investment into the aircraft financing transactions.

62.     Based on the facts alleged herein, Defendants occupied such a relation to Plaintiff as to justify Plaintiff in expecting that its interests would be cared for by Defendants.

63.     For these reasons, a special and confidential relationship existed between Plaintiff and Defendants, based upon the trust, reliance, and confidence that Plaintiff reposed in Defendants' integrity and fidelity.

64.     Accordingly, Defendants owed Plaintiff fiduciary duties to use reasonable care, of loyalty, of honesty, and of disclosure.  Defendants and were required to use their utmost ability to provide sound investment advice, and to act in the Plaintiff' best interests and not for themselves.

65.     Defendants took unfair advantage of Plaintiff's complete reliance on Defendants' advice and exclusive control of the investment and the transactions with Machado and Mercer.  Defendants preyed upon Plaintiff by deploying the scheme described above. Defendants did not want Plaintiff to interact with Machado or Mercer because they considered these types of investments as very lucrative and did not want Plaintiff to circumvent Defendants in the future to avoid the 30% commission.

66.     Defendants breached their fiduciary duty by obtaining Plaintiff's $3,760,000 investment using deceptive, deceitful, and misleading marketing materials and investment advice, depriving Plaintiff of its right to receive disclaimers and safe-harbor notices required to accompany forecasts based on alleged past performance, failing to conduct adequate due diligence and missing numerous "red flags" regarding the individuals and entities involved in the transaction, as well as key differences in structure of the transaction compared to a typical aircraft financing transaction, failing to disclose material facts regarding the security of the investment that would have caused Plaintiff not to invest, and

Exhibit A, Page 25

by acting as an unregistered investment advisors and otherwise engaging in conduct in violation of federal and state laws.

67.    Defendants also recklessly and/or knowingly orchestrated, devised, carried out, participated in, and/or failed to prevent, terminate, or timely correct the wrongdoing alleged herein.

68.    For the reasons set forth above, Defendants breached their obligations and fiduciary duties of reasonable care, of loyalty, of honesty, and of disclosure.

69.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff have been damaged in an amount to be determined according to proof at trial, but not less than $3,760,000.

70.    Defendants engaged in the aforementioned conduct with malice, oppression and/or fraud as those terms are defined in California Civil Code section 3294, which, therefore, warrant an award of punitive and/or exemplary damages.

## SECOND CAUSE OF ACTION

### Professional Negligence

### (Against All Defendants and Does 1-20)

71.    Plaintiff realleges and incorporates by reference each and every allegation set forth hereinabove, inclusive.

72.    Defendants agreed to, and did, render investment advice and related services from year 2020 and on. Defendants owed a duty to Plaintiff to use such skill, prudence and diligence as other members of their profession commonly possess and exercise under similar circumstances in similar communities.

73.    Defendants each breached their professional duties to Plaintiff by failing to exercise reasonable care and competence as to their investment advice, by obtaining Plaintiff's $3,760,0000 investment using deceptive, deceitful, and misleading marketing materials and investment advice, by depriving Plaintiff of its right to receive disclaimers and safe-harbor notices required to accompany forecasts based on alleged past performance, by failing to conduct adequate due diligence and missing numerous "red flags" regarding the individuals and entities involved in the transaction, as well as the

key differences in the structure of the transaction compared to a typical aircraft financing transaction, by failing to disclose material facts regarding the security of the investment that would have caused Plaintiff not to invest, and by acting as an unregistered investment advisors and otherwise engaging in conduct in violation of federal and state laws.

74.    As a direct and proximate cause of Defendants' misconduct, Plaintiff have been damaged in an amount to be determined according to proof at trial, but not less than $3,760,000.

## THIRD CAUSE OF ACTION

### Violation of California Civil Code § 3372 (Professional Malpractice)

### (Against All Defendants and Does 1-20)

75.    Plaintiff realleges and incorporates by reference each and every allegation set forth hereinabove, inclusive.

76.    California Civil Code § 3372 provides that "[a]ny person engaged in the business of advising others for compensation as to the advisability of purchasing, holding or selling property for investment and who represents himself or herself to be an expert with respect to investment decisions in such property, or any class of such property, shall be liable" for the amount of such compensation and damages where the advisor fails to perform with "the due care and skill reasonably to be expected of a person who is such an expert."

77.    Defendants violated Civil Code section 3372 by acting as investment advisors to Plaintiff when they were not licensed, representing themselves to be experts with respect to investment decisions regarding aircraft financing transactions, and failing to perform with the due care and skill reasonably expected of a person who is an expert, as described herein.

78.    Defendants' violations of California Corporations Code section 3372 proximately caused Plaintiff's harm, and Plaintiff is entitled to damages in an amount according to proof, but not less than $3,760,000.

79.    Defendants engaged in the aforementioned conduct with malice, oppression and/or fraud as those terms are defined in California Civil Code section 3294, which, therefore, warrant an award of punitive and/or exemplary damages.

Exhibit A, Page 27

## **FOURTH CAUSE OF ACTION**

### **Fraud**

### **(Against All Defendants and Does 1-20)**

80.     Plaintiff realleges and incorporates by reference each and every allegation set forth hereinabove, inclusive.

81.     Defendants employed a scheme using fraudulent and misleading marketing materials, investment advice, and ongoing misrepresentations and omissions to induce Plaintiff into investing $3,760,000 as part of the Refundable Purchase Deposits to be held in escrow by WBAT, and to induce Plaintiff into agreeing to pay Defendant JDS1 30% of all profits received with respect to the investment.

82.     Defendants made these misrepresentations with the knowledge that they were false or with a reckless disregard for their truth or omissions of material information.

83.     Defendants made these misrepresentations with the intent that Plaintiff rely on them in deciding whether to invest.

84.     Plaintiff reasonably relied on Defendants' misrepresentations based on their purported knowledge, experience, and expertise, and based on the trust and confidence reposed in them.  Had Plaintiff known that Defendants' representations were false, Plaintiff would not have made the investment.

85.     As the proximate cause of Plaintiff's reasonable reliance on Defendants' material misrepresentations and omissions, Plaintiff has been damaged in an amount to be determined according to proof at trial, but not less than $3,760,000.

86.     Defendants engaged in the aforementioned conduct with malice, oppression and/or fraud as those terms are defined in California Civil Code section 3294, which, therefore, warrant an award of punitive and/or exemplary damages.

## FIFTH CAUSE OF ACTION

### Negligent Misrepresentation

### (Against All Defendants and Does 1-20)

87.     Plaintiff realleges and incorporates by reference each and every allegation set forth hereinabove, inclusive.

88.     Defendants employed a scheme using fraudulent and misleading marketing materials, investment advice, and ongoing misrepresentations and omissions to induce Plaintiff into investing $3,760,000 as part of the Refundable Purchase Deposits to be held in escrow by WBAT, and to induce Plaintiff into agreeing to pay Defendants 30% of all profits received with respect to the investment.

89.     Defendants misrepresented to Plaintiff that all of the facts set forth above were true, even though those representations were not true.

90.     To the extent Defendants may have believed that the representations set forth above were true, they had no reasonable ground to believe those representations to be true when they were made.

91.     Defendants made the misrepresentations with the intent that Plaintiff rely on them.

92.     Plaintiff reasonably relied on Defendants' misrepresentations based on Defendants' knowledge, experience, and expertise, and based on the trust and confidence reposed in them.  Had Plaintiff known that Defendants' representations were false, Plaintiff would not have made the investment.

93.     As the proximate cause of Plaintiff's reasonable reliance on Defendants' material misrepresentations and omissions, Plaintiff has been damaged in an amount to be determined according to proof at trial, but not less than $3,760,000.

94.     Defendants engaged in the aforementioned conduct with malice, oppression and/or fraud as those terms are defined in California Civil Code section 3294, which, therefore, warrant an award of punitive and/or exemplary damages.

## SIXTH CAUSE OF ACTION

### Violation of Investment Advisers Act, 15 U.S.C. § 80a-15(a) *et seq.*

### (Against All Defendants and Does 1-20)

95.     Plaintiff realleges and incorporates by reference each and every allegation set forth hereinabove, inclusive.

96.     The Investment Advisers Act ("IAA"), 15 U.S.C. § 80a-15(a), requires investment advisers to register with the Securities and Exchange Commission ("SEC"). The IAA provides that investment contracts entered into by unregistered investment advisors are void and that investors may bring actions for equitable relief, pursuant to 15 U.S.C. § 80b-15(b).

97.     Plaintiff entered into a profit-sharing agreement with JDS1, whereby Plaintiff agreed to pay JDS1 30% of all profits received with respect to the investment.

98.     Plaintiff is informed and believes, and on that basis thereon alleges, that Defendant JDS1 was not registered as an investment adviser with the SEC at the time Plaintiff entered into the profit-sharing agreement with Defendant.

99.     Defendant JDS1 violated the IAA by entering into the profit-sharing agreement as an unregistered investment advisor.

100.    Pursuant to the IAA, Plaintiff is entitled to rescind the agreement.

## SEVENTH CAUSE OF ACTION

### Violation of California Corporations Code § 25235

### (Against All Defendants and Does 1-20)

101.    Plaintiff realleges and incorporates by reference each and every allegation set forth hereinabove, inclusive.

102.    California Corporations Code §25235 provides in relevant part:

It is unlawful for any investment adviser, directly or indirectly, in this state:

(a) To employ any device, scheme, or artifice to defraud any client or prospective client.

Exhibit A, Page 30

1   (b)  To engage in any transaction, practice, or course of business which operates or

2   would operate as a fraud or deceit upon any client or prospective client.

3   ...

4   (d)  To engage in any act, practice, or course of business which is fraudulent,

5   deceptive, or manipulative. The commissioner shall, for the purpose of this

6   subdivision, by rule define and prescribe means reasonably designed to prevent

7   such acts, practices, and courses of business as are fraudulent, deceptive, or

8   manipulative.

9   (e)  To represent that he is an investment counsel or to use the name "investment

10   counsel" as descriptive of his business unless his principal business consists of

11   acting as investment adviser and a substantial part of his business consists of

12   rendering investment advisory services on the basis of the individual needs of his

13   clients.

14   103.   Defendants violated Corporations Code section 25325 by acting as investment advisors to

15   Plaintiff, whose principal place of business is in the State of California, when they were not licensed,

16   and by making material misrepresentations and omissions to Plaintiff regarding their aircraft financing

17   transactions, as described herein.

18   104.   Plaintiff relied on Defendants' misrepresentations when Plaintiff invested $3,760,000 as

19   refundable purchase deposits, which were to be held in escrow by WBAT.

20   105.   Defendants' violations of California Corporations Code §25325 proximately caused

21   Plaintiff's harm, and Plaintiff is entitled to damages in an amount according to proof, but not less than

22   $3,760,000.

23   106.   Plaintiff also is entitled to treble damages and attorneys' fees, pursuant to Code of Civil

24   Procedure section 1029.8, which states: "Any unlicensed person who causes injury or damage to another

25   person as a result of providing goods or performing services for which a license is required

26   under...Chapter 2 (commencing with Section 25210) or Chapter 3 (commencing with Section 25230) of

27   Part 3 of Division 1 of Title 4 of the Corporations Code, shall be liable to the injured person for treble

28

the amount of damages assessed in a civil action in any court having proper jurisdiction. The court may, in its discretion, award all costs and attorney's fees to the injured person if that person prevails in the action."

## EIGHTH CAUSE OF ACTION

### Violation of California Corporations Code § 25400 *et seq.* and 2550 *et seq.*

### (Against All Defendants and Does 1-20)

107.    Plaintiff realleges and incorporates by reference each and every allegation set forth hereinabove, inclusive.

108.    Based on Defendants' conduct in the state of California with respect to Plaintiff, Defendants have violated the anti-fraud provisions of the California Corporate Securities Law of 1968.

109.    California Corporations Code § 25401 provides that "[i]t is unlawful for any person to offer or sell a security in California, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading."

110.    California Corporations Code § 25501 provides in pertinent part that "[a]ny person who violates Section 25401 shall be liable to the person who purchases a security from him or sells a security to him, who may sue either for rescission or for damages (if the plaintiff or the defendant, as the case may be, no longer owns the security)[.]"

111.    Defendants violated California Corporations Code section 25401 by making the above-described material misrepresentations and omissions of facts to Plaintiff, whose principal place of business is in California, in connection with the sale, marketing, and investment advice that induced Plaintiff to invest $3,760,000 into the Refundable Purchase Deposits for the aircraft financing transactions.

112.    Plaintiff's investment in the Refundable Purchase Deposits is a "security" as that term is defined in the Corporate Securities Law of 1968, and Defendants sold the securities to Plaintiff.

113.    Defendants' conduct, including their conduct directed toward Plaintiff in California, fraudulently induced Plaintiff to follow Defendants' advice and invest $3,760,000 in the Refundable Purchase Deposits, as described herein. At the time when Plaintiff invested in the Refundable Purchase Deposits, Defendants knew, or should have known, material information that would have significantly affected Plaintiff's decision to invest, as described herein.

114.    Plaintiff reasonably and justifiably relied upon Defendants' representations of facts set forth above based on their purported expertise, fiduciary duties and the reposed trust and confidence placed with them.

115.    Defendants' violations of California Corporations Code §25401 proximately caused Plaintiff's harm, and Plaintiff is entitled to damages in an amount according to proof.

116.    Alternatively, Plaintiff is entitled to rescind its interest in the Refundable Purchase Deposits, including return of its investment capital, plus interest at the legal rate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them:

1.    For an order rescinding the $3,760,0000 investment made by Plaintiff;

2.    For an order awarding Plaintiff compensatory damages, including but not limited to, benefit of the bargain, consequential and/or net out-of-pocket, in an amount according to proof at trial;

3.    For an order awarding Plaintiff general and special damages in an amount, according to proof at trial;

4.    For an order awarding Plaintiff punitive and exemplary damages necessary to punish Defendants in an amount, according to proof at trial;

5.    For an order awarding Plaintiff treble damages and attorneys' fees, pursuant to Code of Civil Procedure section 1029.8;

6.    For an order awarding Plaintiff disgorgement of all ill-gotten gains by which Defendants have been unjustly enriched, and restitution in an amount according to proof at trial;

7.     For an order imposing a constructive trust, ordering an accounting, and/or awarding all other proper equitable relief according to proof at trial;

8.     For an order awarding Plaintiff costs of litigation in an amount and according to proof at trial;

9.     For an order that the Court award Plaintiff pre-judgment and post-judgment interest as provided by law;

10.    Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury as to all issues so triable in this action.

**REIF LAW GROUP, P.C.**

Dated:  March 15, 2021          By:     *Brandon S. Reif*
                                        Brandon S. Reif
                                        Marc S. Ehrlich
                                        Attorneys for Plaintiff

# EXHIBIT 1



# CCUR HOLDINGS, INC.

## AIRCRAFT FINANCE OPPORTUNITY
### AUGUST 2020

CONFIDENTIAL

# OPPORTUNITY OVERVIEW

## FULLY REFUNDABLE AVIATION DEPOSITS

- CCUR Holdings, Inc. ("CCUR" or the "Company") believes there is a significant opportunity to provide fully refundable deposits into the aircraft finance market

  — To date, CCUR has funded 10 transactions for a total of $23.25mm; including our partners, more than $35mm has been funded since August 2018

  — Across all deals, the Company has generated an annualized return of almost 23%, something we believe is extremely attractive given the cash like nature of the investment

- CCUR has partnered with one specific broker and a national recognized title company to create a unique and secure structure that provides fully refundable deposits during the initial due diligence period for aircraft

  — This opportunity exists because the global marketplace for aircraft transactions is highly opaque, requiring buyers and sellers to rely on a disjointed brokerage community to match interested parties; soft money deposits are necessary due to a common practice of back-to-back purchase agreements (where the broker becomes the buyer) in order for the broker to be able to earn a profit on the transaction

  — The typical length of a deposit is 4 months, with up to two 30-day extension options at an additional pre-paid fee; this time is typically used for preliminary engineering work

  — Most importantly, the structure of the soft money deposits is such that CCUR always remains in full control of the funds and is the sole party that can order the release of funds from escrow

- Leveraging a significant tailwind in aviation, Passenger to Cargo Conversions, we believe we can maintain a consistent flow of $20-$30mm of deals at any given time

CCUR HOLDINGS, INC.

2



STRUCTURE

ALL FUNDS SECURELY HELD IN ESCROW WITH TITLE COMPANY

CCUR HOLDINGS, INC.

3

# STAGES OF THE AIRCRAFT PURCHASE

## CCUR ONLY PARTICIPATES IN THE LOI/PRE-INSPECTION STAGE

- **LOI/Pre-Inspection Stage (CCUR soft money deposit only covers this stage)**
  — The LOI stage is typically a short period of time during which the buyer and seller negotiate the purchase agreement; due to the unique cargo conversion focus of our deals, the LOI stage is often longer than a traditional LOI period (some of our agreements have actually been purchase agreements at this stage, but the actual terms are identical to a typical LOI)
  — During this period, an agreed upon Refundable Purchase Deposit is wired to a third-party aviation escrow company as proof of funds so that the buyer can perform the necessary pre-inspection engineering work
  — During this period there is no physical inspection of the aircraft and our deposit is returned immediately prior to the pre-purchase inspection; this stage has averaged approximately 4 months for CCUR

- **Purchase Agreement (hard money deposit)**
  — If the buyer decides to move forward after the engineering work is complete, the Refundable Purchase Deposit is replaced with a replacement deposit
  — A pre-purchase inspection is then scheduled and performed

- **Technical Acceptance, Delivery and Closing**
  — After the pre-purchase inspection is completed, buyer and seller negotiate the Technical Acceptance based upon the results of the inspection
  — FAA Aircraft Registry, FAA Bill of Sale and FAA Application for Registration are filed, as well as any lien docs
  — Closing and delivery occur

CCUR HOLDINGS, INC.                                                4

# DOCUMENTS

## CRITICAL PROVISIONS

- **Escrow Agreement**

  — CCUR has used Wright Brothers Aircraft Title, Inc. for all its deals; all escrowed funds are held in the Wright Brothers Trust Account at Bank of America; CCUR is also named as an additional insured under the title company's crime insurance policy

  — The deposit can only be returned to CCUR and must be returned to CCUR under enumerated circumstances such as the termination of the Aircraft Purchase Agreement, upon demand by CCUR and on the earlier of the stated return date or immediately prior to the time of the inspection

  — There is no contractual privity between the title company and the buyer, thereby making it clear that the title company can only take direction from CCUR

- **Letter Agreement (personally guaranteed by buyer)**

  — The buyer enters into a letter agreement with CCUR pursuant to which, for a prepaid fee, CCUR agrees to post a fully Refundable Purchase Deposit with the title company; the terms governing the release of the deposit in the Letter Agreement mirror the terms under the Aircraft Purchase Agreement

- **Aircraft Purchase Agreement**

  — Executed between the Buyer and Seller, the agreement enumerates a variety of circumstances under which the Refundable Purchase Deposit is to be returned to CCUR, which is the earlier of the stated return date or immediately prior to the time of inspection

CCUR HOLDINGS, INC.

5

# DOCUMENTS

## SAMPLE DOCUMENTS

- **Complete redacted versions of all deal documents available by request**

CONFIDENTIAL

**ESCROW AGREEMENT**

THIS ESCROW AGREEMENT (the "Agreement") made this 14th day of May, 2020 by and between [redacted], whose address is [redacted] Oklahoma City, OK 73170 (the "Escrow Agent") and CCUR Holdings, Inc. (the "Depositor"), whose address is 6470 East Johns Crossing, Suite 490, Duluth, GA 90037.

WITNESSETH

**WHEREAS**, South [redacted], as Buyer ("[redacted]"), and [redacted], as Seller ("[redacted]"), have entered into that certain Aircraft Purchase Agreement dated May 14, 2020 (the "APA", capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the APA) contemplating the purchase by [redacted] of that certain Boeing 777-367 (ER) having Manufacturer Serial Number [redacted] and Registration Number [redacted] (the "Aircraft"), a copy of which is attached hereto (capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the APA); and

**WHEREAS**, [redacted] and Depositor have entered into a certain letter agreement (the "[redacted] Letter Agreement") pursuant to which Depositor has agreed to provide a portion of the fully Refundable Purchase Deposit contemplated by the APA (in the aggregate amount of Five Million and No/100 Dollars ($5,000,000.00) in the amount of Two Million Five Hundred Thousand and No/100 Dollars ($2,500,000.00)(the "Deposit"), for the benefit of [redacted], on and subject to the terms and conditions contained in the [redacted] Letter Agreement; and

**WHEREAS**, contemporaneously herewith, [redacted] has entered into letter agreements on substantially the same terms and conditions as the [redacted] Letter with each of [redacted] and [redacted] (collectively, the "Remainder Letter Agreements"), pursuant to which [redacted] and [redacted] will provide the remaining portion of the fully Refundable Purchase Deposit contemplated by the APA (the "Remainder Deposit"); and

**WHEREAS**, the Depositor desires to deposit, or cause to be deposited for its benefit, funds constituting a portion of the fully Refundable Purchase Deposit with the Escrow Agent, and the Escrow Agent has consented to hold such funds, pursuant to the terms and conditions hereof

**NOW THEREFORE**, the Escrow Agent and the Depositor agree as follows:

1. The Depositor hereby appoints [redacted] as Escrow Agent under this Agreement. The Escrow Agent hereby accepts such appointment and agrees to hold, invest and disburse all funds received from or on behalf of the Depositor in accordance with the terms of this Agreement

2. The Escrow Funds constituting the Deposit shall consist of Two Million Five

CONFIDENTIAL

May 14, 2020

[redacted]
President
South [redacted], Florida [redacted]

Dear Mr. [redacted]:

The purpose of this Letter Agreement is to set forth the terms and conditions by which CCUR Holdings, Inc. with its principal place of business at 6470 East Johns Crossing, Suite 490, Duluth, GA 30097 ("Depositor") will make available to South [redacted], a Florida corporation with its principal place of business located at [redacted] FL [redacted] ("South"), and [redacted] ("Guarantor"), a wholly refundable deposit of Two Million Five Hundred Thousand and No/100 Dollars ($2,500,000.00) (which is defined, for purposes of this Letter Agreement, as the "Refundable Deposit") for use in connection with the purchase of that certain Boeing 777-367 (ER) having Manufacturer Serial Number [redacted] and Registration Number [redacted] (the "Aircraft"), and the consideration that South owes Depositor in return for use of the Refundable Deposit.

The Refundable Deposit represents a portion of the fully refundable deposit (the "Refundable Purchase Deposit") contemplated by that certain Aircraft Purchase Agreement dated May 14, 2020, between [redacted], as Seller, and South [redacted], as Buyer, a copy of which is attached hereto as Exhibit A (the "APA"; capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the APA), requiring the Buyer to place a deposit of Five Million Dollars ($5,000,000.00) into escrow with the Escrow Agent (defined below) as the fully Refundable Purchase Deposit. The remaining portion of the Refundable Purchase Deposit (the "Remainder Deposit") is being provided contemporaneously by [redacted] (collectively, the "Remainder Depositors") pursuant to letter agreements of even date herewith between South, on the one hand, and each of the Remainder Depositors, on the other hand (the "Remainder Letter Agreements"). South represents and warrants to Depositor, that the Fully Refundable Deposit under the APA is fully refundable to CCUR pursuant to the express terms of the APA. By this Letter Agreement, Depositor is agreeing that the deposit of the Refundable Deposit with the Escrow Agent shall be used to satisfy a portion of the Fully Refundable Deposit requirements under the APA. Depositor and South acknowledge that it is South's present intention to take acceptance of the Aircraft not later than September 14, 2020, and ensure that the Refundable Deposit shall be returned to Depositor not later than September 14, 2020. Based on this understanding, the parties agree to the following:

1. <u>Method of Deposit.</u> Depositor will cause the deposit of the Refundable Deposit into an escrow account with [redacted], Oklahoma City, Oklahoma 73170 (the "Escrow Agent") pursuant to a mutually agreed upon escrow agreement between the Depositor and the Escrow Agent. Depositor and South acknowledge and

Exhibit A

**AIRCRAFT PURCHASE AGREEMENT, May 14, 2020**

| | | | |
|---|---|---|---|
| ***Purchaser's Information:*** | | ***Seller's Information:*** | |
| Company: | South [redacted] | Company: | [redacted] Inc |
| Address: | [redacted] | Address: | [redacted] |
| City / State: | [redacted] FL | City / State: | [redacted] CA |
| Zip: | 33315 | Zip: | 91406 |
| ***Aircraft Information:*** | | ***Engine Information:*** | |
| Make: | Boeing | Make: | General Electric |
| Model: | 777-307 (ER) | Model: | GE90-115B |
| Serial Number: | [redacted] | Engine Serial No(s): | [redacted] |
| Registration Number: | | | |
| ***Purchase Information:*** | | ***Delivery Information:*** | |
| Purchase Price: | US$ 25,000,000.00 | Delivery Location: | TBD |
| Refundable Purchase Deposit: | US$ 5,000,000.00 | Closing Date: | On or Before September 14 th, 2020 |

Seller is the owner of or otherwise authorized to sell the above-described aircraft and engine(s), together with the avionics, equipment and instrumentation presently installed thereon or thereon (collectively, the "Aircraft"), and all logbooks, flight manuals, checklists, and any other records, paperwork or minor equipment for the Aircraft in Seller's possession (the "Aircraft Documentation"). Seller agrees to sell the Aircraft and Aircraft Documentation to Purchaser and Purchaser agrees to purchase the Aircraft and Aircraft Documentation pursuant to the terms of this Aircraft Purchase Agreement (this "Agreement").

**TERMS AND CONDITIONS:**

1. **Prices and Payments:**
   a. <u>Purchase Price.</u> In consideration for the purchase of the Aircraft, Purchaser agrees to pay Seller the Purchase Price.
   b. <u>Purchase Deposit.</u> Through a third party lender, CCUR Holdings, Inc. (the "Depositor"), Purchaser has placed the initial fully <u>Refundable Purchase Deposit</u> into escrow at Wright Brothers Aircraft Title. The Refundable Purchase Deposit will remain refundable to the Depositor at all times under this Agreement. Prior to the time of the inspection set forth in Exhibit C hereto, Purchaser will replace the Refundable Purchase Deposit made by the Depositor with a replacement deposit of the same amount placed into escrow at [redacted] (the

Seller's Initials　　Page 1 of 9　APA: [redacted]　　Purchaser's Initials

# RETURN PROFILE

## 10 DEALS COMPLETED SINCE AUG 2018

- CCUR has completed a total of $23.25mm of fully refundable deposits since August 2018, representing 10 deals; including our partner, in excess of $35mm has been deployed across the 10 deals
  - This strategy has returned a 22.8% annualized return with a duration of less than 4 months
  - Individual deal details are show below

## Aviation Deposit History

| Deposit Date | Amount | Term (days) | Fee | % Fee | % Fee annualized | Extension Details | Status | Escrow Agent |
|---|---|---|---|---|---|---|---|---|
| 8/10/2018 | $ 1,000,000 | 180 | $ 60,000 | 6.0% | 12.17% | | Repaid | Wright Bros |
| 8/10/2018 | $ 1,000,000 | 180 | $ 60,000 | 6.0% | 12.17% | | Repaid | Wright Bros |
| 2/28/2019 | $ 2,750,000 | 181 | $ 178,200 | 6.5% | 13.07% | | Repaid | Wright Bros |
| 9/27/2019 | $ 3,000,000 | 31 | $ 90,000 | 3.0% | 35.32% | | Repaid | Wright Bros |
| 10/30/2019 | $ 5,000,000 | 182 | $ 600,000 | 12.0% | 24.07% | 120 day initial term + $100,000 for 60 day extension | Repaid | Wright Bros |
| 5/14/2020 | $ 2,500,000 | 123 | $ 150,000 | 6.0% | 17.80% | 60 day extension option for $82.5k | Due 9.14.20 | Wright Bros |
| 5/14/2020 | $ 2,500,000 | 123 | $ 150,000 | 6.0% | 17.80% | 60 day extension option for $82.5k | Due 9.14.20 | Wright Bros |
| 5/14/2020 | $ 500,000 | 32 | $ 20,000 | 4.0% | 45.63% | | Repaid | Wright Bros |
| 6/17/2020 | $ 2,500,000 | 62 | $ 112,500 | 4.5% | 26.49% | | Repaid | Wright Bros |
| 6/17/2020 | $ 2,500,000 | 62 | $ 112,500 | 4.5% | 26.49% | | Repaid | Wright Bros |
| | $ 23,250,000 | | $ 1,533,200 | | 22.83% | | | |

# PASSENGER TO CARGO CONVERSIONS

## UNIQUE EXPOSURE TO SIGNIFICANT INDUSTRY TAILWIND

- Passenger to Cargo Conversions are one of the few tailwinds in the commercial aircraft space and our broker partner has targeted exposure to this segment
  - CCUR's involvement in the Aircraft Purchase Agreement precedes any physical inspection of the aircraft, which is only performed once the Replacement Deposit is substituted for our deposit
  - During the period that our deposit is in place, all work is performed away from the aircraft and is typically focused on engineering work to plan for the conversion and to ensure the plans are approved by the FAA
  - Our broker partner works with entitles such as IAI, who specialize cargo conversions of the B767, B737 and B747 aircraft families
  - Some images of the work IAI has performed are show below






CCUR HOLDINGS, INC.

8

# CURRENT DEPOSIT OPPORTUNITY

## $10MM DEPOSIT FOR TWO 767 AIRCRAFT

- CCUR has a current opportunity to fund deposits for two 767s that are expected to be Passenger to Cargo Conversions

  — Each aircraft represents a separate deal

  — A term sheet for the current opportunity is shown below

| Key Terms | |
|---|---|
| Amount: | $10,000,000 |
| Rate: | 6% paid in advance |
| Maturity: | 11/26/2020 |
| Extension: | One 30-day option (2% in advance) |
| Escrow Company: | Wright Brothers Aircraft Title |
| | |
| **Aircraft** | |
| Deal 1 Aircraft | 2010 Boeing 767-32L (ER) |
| | Registration 4K-AI01 |
| | Serial Number 40342 |
| | $25mm purchase price |
| | |
| Deal 2 Aircraft | 2010 Boeing 767-32L (ER) |
| | Registration 4K-AZ81 |
| | Serial Number 40343 |
| | $25mm purchase price |

CCUR HOLDINGS, INC.

9



# CCUR HOLDINGS, INC.

6470 EAST JOHNS CROSSING
SUITE 490
DULUTH, GA 30097
(770) 305-6434

CCUR HOLDINGS, INC.                                                        10